Christina WESTON–SMITH, Plaintiff

v.

COOLEY DICKINSON HOSPITAL, INC., Defendant

Civil Action No. 00–30029–MAP.

United States District Court, D. Massachusetts.

Aug. 13, 2001.

**66**

Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, PC, Springfield, MA, for plaintiff.

Guy P. Tully, Jackson, Lewis, Schnitzler & Krupman, Boston, MA, for defendant.

PONSOR, District Judge.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

(Docket No. 20)

## I. INTRODUCTION

Plaintiff, Christina Weston–Smith ("Weston–Smith"), claims that she was fired by defendant, Cooley Dickinson Hospital, Inc. (the "Hospital"), because she took maternity leave. She has brought suit seeking damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1988) ("Title VII") and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et. seq.* ("FMLA"). The Hospital, contending that plaintiff's lay-off was merely part of a Hospital-wide reorganiza-

tion, has filed a motion for summary judgment on both of these claims.

The Hospital's motion will be granted and summary judgment entered in its favor. As will be seen, the record contains no direct evidence of discriminatory animus. More importantly, no sufficient circumstantial evidence suggests that the Hospital's proffered explanation for plaintiff's lay-off was a pretext to camouflage unlawful behavior.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court must view all the evidence in the light most favorable to the nonmoving party, "drawing all reasonable inferences in that party's favor." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 42 (1st Cir. 1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). Nevertheless, summary judgment may be appropriate if the nonmoving party rests on "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990); *see also Conward v. Cambridge School Committee,* 171 F.3d 12, 18 (1st Cir.1999) (refusing, on motion for summary judgment, "to indulge rank speculation or unsupportable hyperbole").

## III. BACKGROUND

The record, viewed in the light most favorable to the plaintiff, presents the following facts. The Hospital hired Weston–Smith in April 1996 to be the Director of Peri-operative Services. In this position she was responsible for the hospital's treatment of patients immediately before and after surgical procedures and had administrative responsibility for the Hospital's surgical services, post-anesthesia care and surgical daycare units. She was supervised by Donna Bowles, Vice President of Nursing.

In April 1998 Weston–Smith took maternity leave. She returned to work part time on May 10, 1998, although her leave was not scheduled to end until August 2, 1998. While working part time, plaintiff overheard a surgeon and anesthesiologist complain that she had been inaccessible during the span of her maternity leave. According to Weston–Smith, the doctors indicated that they intended to complain to Craig Melin ("Melin"), the President and CEO of the Hospital. Melin, however, testified that he never received any such complaints. There is no indication that these doctors did speak to Melin, and Melin, for his part, claims that plaintiff's maternity leave played no part in his decision to lay her off.

In August 1998, shortly after her maternity leave officially ended, Melin met with Weston–Smith and informed her that she was being laid off. Melin did not cite Weston–Smith's performance as the reason for her discharge. Instead, he stated that the Hospital had budget constraints and had to restructure its staff for financial reasons. As a result, he said, plaintiff's position as Director of Peri-operative Services had been eliminated.

During their meeting, Melin told Weston–Smith that he was creating a new position entitled Surgical Program Director. This position included many of the tasks that plaintiff had previously handled, but would be directly supervised by him, rather than Donna Bowles. According to Weston–Smith, Melin told her not to apply for the new position because she would not be hired.

The Surgical Program Directorship was awarded to Catherine Neuman ("Neuman"). Neuman began working at the hospital in 1970, more than 25 years before Weston–Smith, as a staff nurse. She had taken on a variety of positions, with increasing responsibility, over the years. Before her promotion to Surgical Program Director, Neuman had worked as Clinical Coordinator for the surgical day care and post anesthesia care units and was responsible for the staffing, educational development and overall functioning of these units. While in this position, she reported to Weston–Smith and it appears the two were friends.

Neuman had taken on other tasks at the Hospital. She was co-chair of a fundraising drive called the Capital Campaign. In addition, Neuman served as the chairperson for the collective bargaining unit of the Massachusetts Nurses Association. In that position, she participated in negotiations with Melin.

At the time Weston–Smith was laid off and told not to apply for the Surgical Program Director position, Neuman had not been officially offered the new job. Melin stated that he had spoken with Neuman briefly about the new position shortly before his meeting with Weston–Smith. Neuman, for her part, stated that she did not know she would be offered the new job at the time Weston–Smith was laid off.

The record is undisputed, however, that at the time he spoke to plaintiff and (according to Weston–Smith) told her not to apply for the new position, Melin intended

to offer Neuman the job, and it was hers to accept. Weston–Smith testified that at some point she did know that Neuman was going to be offered the job, although she could not recall wether she was told that when she was laid off, or whether she found out later. Sharon Gaisor, Vice President of Human Resources, also attended the meeting between plaintiff and Melin. She did not remember whether Melin told Weston–Smith that he was considering Neuman for the new position. It was her understanding, however, that Neuman was the primary candidate at that time, and she believed that Neuman had already been contacted about the new position.

Although the precise scope of the hospital's restructuring is not clear from either party's papers, it does appear that other employees' positions were either changed or reduced at this time. Melin testified that the Vice President of Operations position was eliminated and the employee holding that position was also laid off. In addition, at least two other employees were laid off, although it is not clear what level of responsibility they held.

The total number of staff in the surgical unit did not change as a result of the restructuring. Neuman took the Surgical Program Directorship and a new employee was hired to fill Neuman's old position. The managerial hierarchy did change, however. As Surgical Program Director, Neuman reported directly to Melin. Bowles no longer had supervisory authority over the unit.

The fact that she was laid off so soon after returning from maternity leave made Weston–Smith suspicious and she discussed those suspicions with Neuman. During this discussion, according to plaintiff, Neuman told Weston–Smith that she had spoken with Bowles and that Bowles had told Neuman that Weston–Smith's maternity leave had been a factor in her dismissal. Some time later, Weston–Smith confronted Bowles and asked her whether this was true. According to Weston–Smith, Bowles did not respond, blushed, looked apologetic and changed the subject. Neuman denies that Bowles told her that Weston–Smith's maternity leave was a factor in her lay-off, and denies ever saying this to plaintiff. Bowles denies that Weston–Smith ever confronted her about this supposed statement.

## IV. DISCUSSION

Weston–Smith has anchored her case on two points; either one, she argues, is sufficient to avoid summary judgment and entitles her to trial by jury. First, she says that her conversations with Bowles and Neuman provide direct evidence of discrimination. This evidence, she claims, satisfies her summary judgment burden without resort to the *McDonnell Douglas* burden-shifting framework commonly used in employment discrimination cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Second, she argues that summary judgment is improper even under *McDonnell Douglas*. She contends that she has proffered sufficient evidence to show that the Hospital's stated reason for laying her off was a pretext and, as a result, she should be able to proceed to trial. Unfortunately for plaintiff, neither argument is supported by the record. This memorandum will first address the issue of direct evidence and then analyze the evidence according to the *McDonnell Douglas* framework.

### A. Direct Evidence

 Weston–Smith is correct that direct evidence of discrimination removes a case from the *McDonnell Douglas* framework. *See, e.g., Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir.1996).

When a plaintiff presents direct evidence of discrimination, the evidentiary burden shifts to the employer. The employer must "affirmatively prove that it would have made the same decision even if it had not taken the protected characteristic into account." *Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 421 (1st Cir.1996); *citing Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion). Given *Price Waterhouse,* direct evidence of discrimination makes it difficult, although not impossible, for a defendant to obtain summary judgment. *See, Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 429 (1st Cir. 2000).

■ As the First Circuit has noted, the line between direct and circumstantial evidence is sometimes hard to discern. *See, Dominguez–Cruz,* 202 F.3d at 429; *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 582–583 (1st Cir.1999) (noting that the First Circuit has yet to choose between the different approaches to "direct evidence" and "circumstantial evidence"). Despite the vagueness of the distinction, the First Circuit has held that a statement must, at a minimum, be *unambiguous* in order to be considered direct evidence of discrimination. *See Fernandes,* 199 F.3d at 583. "[A] statement that plausibly can be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus and, thus, does not constitute direct evidence." *Id.*

Here, the reported conversations are both of doubtful admissibility and so ambiguous that they cannot be considered direct evidence of discrimination.

■ The first conversation, supposedly between Weston–Smith and Neuman, is double hearsay; Weston–Smith wishes to testify about statements Neuman made to her regarding a conversation in which Bowles made statements to Neuman. As Weston–Smith all but concedes, this evidence is inadmissible and, therefore, "cannot be taken into account for purposes of the summary judgment calculus." *Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 615 (1st Cir.2000).

■ As to the second interaction— where plaintiff confronted Bowles and Bowles looked embarrassed and changed the subject—plaintiff must clear two hurdles to get this evidence before the jury. First, plaintiff must persuade the court to permit the jury to consider Bowles' silence as a possible admission that Bowles had, in fact, told Neuman that the maternity leave was a factor in the decision to terminate Weston–Smith. Under this construction, Bowles' silence reflected Bowles' guilt, contrition or general consternation at having her confession to Neuman revealed, and not something else—such as an effort to avoid a scene with a terminated former colleague, or shock and disbelief at the suggestion that Neuman would say anything so false and ridiculous. Second, having found that the silence did constitute Bowles' admission that Bowles had really said this to Neuman, the jury would then have to infer from this admission that the maternity leave, in fact, *was* a factor in the defendant Hospital's termination decision. This second hedge is especially steep, since Bowles was not the decision-maker with regard to Weston–Smith (though she was apparently consulted), and Melin, who was the decision-maker, has denied considering the maternity leave at all.

It would be one thing to put Bowles on the stand to say that Melin considered the plaintiff's maternity leave despite his denial—which plaintiff concededly cannot do, since Bowles denies any such thing. It would be another for Weston–Smith herself to take the stand and testify that

Bowles told her that Melin considered the maternity leave—which plaintiff also cannot do, since Bowles never said anything of the sort to her. It is *quite* another for Weston–Smith to testify that she confronted Bowles with the accusation that Neuman told her (Weston–Smith) that Bowles told Neuman that the maternity leave was a factor, and in response Bowles was silent, looked embarrassed, and changed the subject.

Whatever this evidence may be, it is certainly not "direct" evidence of discrimination. As in *Fernandes*, the interaction is subject to multiple interpretations. A jury could easily find that Bowles' silence and discomfort resulted from being confronted by a former co-worker who was upset about losing her job. *See Fernandes*, 199 F.3d at 582 (holding that the statement, "I don't need minorities and I don't need residents on the job", was subject to multiple interpretations); *Speen*, 102 F.3d at 636 (whether statement "Why do I need a 71 year old when I can have a 51 year old?" was direct evidence of age discrimination was an "open question").

In short, Bowles' failure to respond, if admissible at all, is far too flimsy to constitute "direct" evidence of discrimination. As a result, the case will rise or fall within the *McDonnell Douglas* framework.

### B. *McDonnell Douglas*

Both the gender discrimination and FMLA claim fall within the *McDonnell Douglas* burden-shifting framework. *See, Keeler v. Putnam Fiduciary Trust Co.*, 238 F.3d 5, 8–9 (1st Cir.2001) (McDonnell Douglas has been adapted to other kinds of discrimination claims, including FMLA claims); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir.2000) (applying *McDonnell Douglas* to sex discrimination claim).

The three stages of the *McDonnell Douglas* analysis are well documented and can be summarized as follows. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case that (1) she was pregnant and took maternity leave, (2) her job performance had been satisfactory, but (3) the Hospital nonetheless dismissed her from her position while (4) continuing to have her duties performed by a comparably qualified person. *See Smith v. F.W. Morse & Co., Inc.* 76 F.3d at 421.

At the second stage, the burden shifts to the Hospital to produce a valid, nondiscriminatory reason for her dismissal. *See Thomas v. Eastman Kodak Co.*, 183 F.3d at 56. At this stage defendant has only a burden of production, and if sustained the presumption of unlawful discrimination disappears. *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995).

At the third and final stage of the *McDonnell Douglas* framework, the burden shifts back to plaintiff. Now she has the burden of persuasion to establish by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotations omitted).

Weston–Smith satisfies her *prima facie* burden. It is undisputed that she properly took maternity leave and, therefore, is protected both under the FMLA and Title VII. The Hospital laid her off although she was qualified for the position she held. Finally, she was replaced by Neuman, whose qualifications were similar to hers.

In the second stage of the analysis, the Hospital has satisfied its burden of

articulating a legitimate, non-discriminatory reason for its decision. It argues that it laid off Weston–Smith as part of a Hospital-wide restructuring, and that it hired Neuman for the new position because she had a long history with the Hospital, had worked closely with Melin and had impressed Melin with her leadership and management skills.

Weston–Smith, however, has failed to meet her burden in the third stage of the *McDonnell Douglas* framework. Even taking the evidence in the light most favorable to her—including Bowles' "silent admission"—Weston-Smith has failed to generate a genuine issue of material fact regarding whether the Hospital's proffered motive for laying her off was pretext.

Plaintiff makes a number of arguments in support of her pretext theory. First, she argues that the Hospital's financial justification—that it had to restructure in order to meet budget constraints—was a pretext. Second, Weston–Smith contends that the newly created position of Surgical Program Director was identical to her former position. Third, plaintiff claims that the doctors' overheard complaints are probative of discriminatory intent. Finally Weston–Smith attacks Neuman's qualifications both with respect to the posted requirements for the Surgical Program Director and also in comparison to her own qualifications. These arguments, both in themselves and taken as a whole, do not create a genuine issue of material fact regarding pretext. Each of these contentions will be discussed in turn.

### 1. *Restructuring*

██ It is well settled that "an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII [or the FMLA] even though those positions are held by members of protected groups." *Smith* 76 F.3d at 422. Nevertheless, "an employer who selectively cleans house cannot hide behind convenient euphemisms such as 'downsizing' or 'streamlining,'" *id.*, or, in this case, "restructuring."

██ Here, the evidence does not indicate that the Hospital used the "restructuring" merely as an opportunity to lay off Weston–Smith. To begin, Weston–Smith was not the only person to lose her job. It is undisputed that at least three other employees were laid off as a result of the restructuring. *See*, Dkt. 22, ex. F (Melin Tr.), pp. 20–21; Dkt. 22, ex. G (Gaisor Tr.), pp. 24–26. Weston–Smith does not suggest that these employees were laid off for any improper purpose. The fact that other employees suffered the same fate as Weston–Smith suggests that the restructuring was not a pretext used to target her.

In addition, Weston–Smith's argument that the Hospital did not save money because it kept the same number of employees on the surgical staff misses the forest for the trees. As the Hospital points out, the restructuring was hospital-wide and not just focused on a selective department. The fact that the surgical unit, in itself, kept the same number of employees does not mean that the Hospital was not motivated by an intention to save money.

In addition, the restructuring did not leave the surgical unit untouched; it eliminated a link in the managerial chain. During Weston–Smith's tenure, the surgical department included Neuman as Clinical Coordinator and Weston–Smith as Director of Peri-operative Services. Weston–Smith reported to Bowles, who then reported to Melin. Under the new regime, Neuman became Surgical Program Director, and a new employee took the po-

sition of Clinical Coordinator. Bowles' responsibilities, however, changed. Neuman did not report directly to Bowles, but rather reported directly to Melin. As a result, although the number of employees associated with the surgical unit may not have changed, the management chain was shortened. The record is clear that the reorganization had an independent, rational basis, untainted by any animus against plaintiff.

### 2. *The Similarity Between the Two Positions*

▇▇▇ Weston–Smith also argues that the new position was identical to her prior position and that the Hospital created it as a smoke-screen for laying her off. As the First Circuit has colorfully noted, "[w]hen an employer defends an employment discrimination case on the ground of position elimination, the position may not, like a Dali painting, fade from one image to another only for the first image to reemerge at the blink of an eye." *Smith*, 76 F.3d at 423. Nevertheless, a position elimination defense is not defeated because "another employee ... is designated to carry out some or all of the fired employee's duties ... or because those duties are otherwise reallocated within the existing work force." *Id.*

No reasonable jury could conclude that Weston–Smith's position simply reemerged as the Surgical Program Director position held by Neuman. To be sure, the Surgical Program Director position did necessarily subsume most of Weston–Smith's responsibilities. Nevertheless, the new position included additional responsibilities, including oversight of the Joint Replacement Center and participation as a senior manager directly responsible to Melin. *See,*

Melin Tr. at 21. The positions are similar, but not so similar to provide evidence that the Hospital eliminated Weston–Smith's position as a pretext for laying her off.

### 3. *The Doctors' Remarks*

▇▇▇ Weston–Smith contends that the conversation she overheard between the doctors is probative of discriminatory intent. Setting aside the recurrent hearsay problems this evidence triggers, there is no connection made between these overheard remarks and the Hospital's decision.

▇▇▇ "[M]ere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal or contextual relevance." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23. Here, the remarks possess no temporal or contextual relevance. It is true that the conversation happened within the months preceding Weston–Smith's discharge and during the pendency of her maternity leave. Yet, there is no evidence that these doctors ever acted on their supposed intention to speak to Melin or played any role whatsoever in the decision to lay Weston–Smith off. Weston–Smith has proffered no evidence connecting this conversation with Melin's decision.[1] *See Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir.) ("[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case").

### 4. *Weston–Smith's and Neuman's Qualifications*

▇▇▇ Finally, Weston–Smith takes issue with Neuman's qualifications, both with re-

---

1. Melin did say that he spoke with two doctors about the restructuring; however, Weston–Smith does not claim that these were the same doctors involved in the conversation she overheard.

spect to the Surgical Program Directorship and in comparison to her own.[2] First, Weston–Smith contends that Neuman did not have the requisite years of management experience required for the Surgical Program Director. She points out that the job description released by the Hospital requires at least five years management experience in "health care administration" as a prerequisite. Weston–Smith claims that Neuman had previously held "union positions" which necessarily excluded management experience.

This argument needlessly splits hairs. The record is clear that Neuman, throughout her employment, had important supervisory roles at the Hospital. It is undisputed that as Clinical Coordinator, Neuman had around-the-clock accountability for the surgical day care and post-anaesthesia care units. Although this was technically a union position, Neuman testified that it had "management and supervisory components," including responsibility for staffing the unit and creating preliminary evaluations of all the employees. Given these responsibilities, the claim that she did not have significant management experience certainly does not support an inference of pretext.

██ Weston–Smith's argument that she was better qualified for the position is similarly not supported by the record. To be sure, Weston–Smith did hold a Masters degree while Neuman did not. Nevertheless, Neuman had a long history with the Hospital and had worked closely with Melin, who testified that he was impressed with her skills. In addition, Weston–

Smith herself stated that Neuman had demonstrated her abilities both as the nurse-in-charge on the post-anaesthesia care unit and as the Chairperson on the Campaign 2000 charity drive. Given her experience, Neuman's lack of a Masters degree is irrelevant.

In sum, even in combination, and assuming that a jury were permitted to consider, and in fact concluded, that Bowles "admitted" her remark to Neuman, the evidence falls far short of the quantum necessary to demonstrate a pretext for discriminatory animus.

## V. CONCLUSION

It is never a pleasant task to tell a plaintiff who sincerely feels she was treated unjustly that her case is too weak to warrant a jury trial. Nevertheless, despite counsel's vigorous and resourceful efforts, the facts even viewed in the light most favorable to plaintiff are simply insufficient to justify any reasonable jury in finding for her.

For this reason, defendant's Motion for Summary Judgment must be granted. The court will order entry of judgment for defendant on both the Title VII and FMLA employment discrimination claims.

A separate order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, defendant's Motion

---

**2.** In a similar argument, Weston–Smith contends that she was laid off and discouraged not to apply for the new position even though the job had not yet been offered to Neuman. She argues that this time disparity is evidence that she was discouraged from applying not because Neuman was taking the job but because of bias against her. This argument is

not supported in the record. It may be true that Neuman had not been formally offered the job when Weston–Smith was laid off. But it is certainly clear that Melin had her in mind for the position and intended to offer her the job. The fact that a formal offer was, perhaps, yet to be made adds nothing to plaintiff's case.

For Summary Judgment is hereby AL-LOWED.

It is So Ordered.