# United States Court of Appeals
## For the First Circuit

_____

No. 01-2284

CHRISTINA WESTON-SMITH,

Plaintiff, Appellant,

v.

COOLEY DICKINSON HOSPITAL, INC.,

Defendant, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, <u>U.S. District Judge</u>]

_____

Before

Boudin, <u>Chief Judge</u>,

Lynch, <u>Circuit Judge</u>,

and Gertner,* <u>District Judge</u>.

_____

    <u>Maurice M. Cahillane</u> with whom <u>Egan, Flanagan and Cohen, P.C.</u> was on brief for appellant.

    <u>Guy P. Tully</u> with whom <u>Laurie J. Hurtt</u> and <u>Jackson Lewis Schnitzler & Krupman</u> were on brief for appellee.

_____

_____

    *    Of the District of Massachusetts, sitting by designation.

March 12, 2002
_____

**LYNCH, <u>Circuit Judge</u>**. Shortly after Christina Weston-Smith returned from her maternity leave in 1998 to her job as Director of Peri-Operative Services at Cooley Dickinson Hospital, she was laid off. Based on comments she overheard, the timing of her dismissal, a comparison of her credentials with those of her replacement, and both a hearsay statement (that her supervisor said to her replacement that Weston-Smith's leave caused her to lose her job) and her supervisor's silence in the face of Weston-Smith's accusations, she believed that she was terminated because of her maternity leave. She brought suit under Title VII, 42 U.S.C. § 2000e-2 (1994), and the anti-retaliation provisions of the Family and Medical Leave Act, 29 U.S.C. § 2615 (1994).

The Hospital denied any discrimination or retaliation. It explained that Weston-Smith was laid off as part of a hospital-wide reorganization of management, and that there were legitimate reasons another employee had been retained instead of Weston-Smith in the new position. It argued that neither the alleged statement nor the silence was admissible, because both were hearsay.

On the Hospital's motion for summary judgment, the district court agreed that all reasonable inferences from the evidence supported the Hospital's position, and entered judgment for the Hospital. Specifically, the court ruled that the statement was inadmissible double hearsay, Weston-Smith v. Cooley Dickinson Hosp., Inc., 153 F. Supp. 2d 62, 69 (D. Mass. 2001); that it was doubtful the silence was admissible and that it certainly did not amount to direct evidence of discrimination, id. at 69-70; and further that Weston-Smith had failed to meet her burden to show the Hospital's explanation was pretextual, id. at 73. We affirm; our analysis of the questions presented on appeal largely mirrors that of the district court's well-reasoned opinion.

I.

We take the facts and reasonable inferences in the light most favorable to Weston-Smith's position. Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 42 (1st Cir. 2002). We sketch only the basic facts; details may be found in the district court opinion. We give a fuller description only of the portions of the facts needed for our decision.

Cooley Dickinson Hospital hired Christina Weston-Smith in April 1996 as its Director of Peri-Operative Services; in that position, she managed the treatment of patients before and

after surgery, as well as the administration of surgical services themselves. She reported to Donna Bowles, the Hospital's Vice President of Nursing. Weston-Smith did well at her job and received good, sometimes excellent, performance evaluations. In April 1998, Weston-Smith took maternity leave, scheduled to last until August; she returned to her position part time in May. She testified at deposition that while working part time, she overheard two doctors complaining about her inaccessibility during her maternity leave.

In August, after the formal end of Weston-Smith's maternity leave, Craig Melin, the Hospital's President and CEO, met with her. Melin informed Weston-Smith that the Hospital was eliminating her position as part of a hospital-wide reorganization. A new position, Surgical Program Director, would perform many of the same tasks as well some additional ones, and would report directly to him rather than to Bowles. Weston-Smith also testified that she was told not to apply for the new position. After terminating Weston-Smith, Melin offered the new position to Cathryn Neumann, formerly the Hospital's Clinical Coordinator and Weston-Smith's subordinate. Neumann accepted.

Weston-Smith came to suspect, based on the conversation that she had overheard between the doctors and on the timing of

her layoff, that Melin's decision was motivated at least in part by her absence during her maternity leave. According to her deposition testimony, Neumann told her that Bowles had said that Weston-Smith's maternity leave had indeed played a part in the layoff decision. Some time later, Bowles invited Weston-Smith to lunch. Regarding that lunch, Weston-Smith testified at deposition:

> Donna [Bowles] invited me out to lunch at the Northampton Brewery and I asked her at that time, during that luncheon which she invited me to, because I had a lot of questions, what was going on, why was I laid off. I asked her about the conversation she had with Cathy Neumann, about the fact that Cathy had told me that the reason I was laid off, I mean that, you know, she had a conversation with Donna about the conversation that Donna and Cathy had had and that Cathy had related that information to me and I asked her about why Donna had said that about the fact that I had been laid off because of my maternity leave and when I asked her that question, when I asked Donna that question at that luncheon, she clearly looked extremely uncomfortable and didn't answer. She sat there and turned color, you know, turned bright red and didn't answer the question, you know, he she [sic] evaded the issue, tried to talk about something different. I tried to bring her back to that question, I wanted to have the answer, but she clearly -- her body language told me that she was well aware of what I was talking about, but she did not answer the question in words.

Bowles denied at deposition that she ever said anything to Neumann regarding the reasons Weston-Smith was laid off. Neumann also denied that Bowles ever said anything of this kind, or that Neumann ever had a conversation on this topic with

Weston-Smith. Weston-Smith's own testimony is therefore the primary evidence that she claims entitles her to a jury trial, although she also makes other arguments that we address in the course of this opinion.

II.

We review de novo the district court's grant of summary judgment. Zapata-Matos, 277 F.3d at 42.

Some years ago the Supreme Court set up two different models for analysis of employment discrimination cases, depending on whether an employee presented direct evidence[1] of discrimination or relied solely on circumstantial evidence. See Price Waterhouse v. Hopkins, 490 U.S. 228, 270-78 (1989) (O'Connor, J., concurring) (describing the direct evidence model); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973) (describing the circumstantial evidence model). Like the parties, we apply the distinction drawn by these cases.[2] As the

---

[1]     For a description of the differing requirements adopted by the circuits for the application of Price Waterhouse, see Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 582 (1st Cir. 1999). For present purposes, we will simply refer to such cases as those involving "direct evidence."

[2]     Weston-Smith has alleged claims under both Title VII and the anti-retaliation provisions of the Family and Medical Leave Act. The parties have treated the standards under the two Acts as the same. So do we. To be clear, however, our discussion of the 1991 amendments to Title VII in the text applies specifically to that statute and not to the Family and Medical Leave Act.

Supreme Court has recently reemphasized, however, the <u>McDonnell Douglas</u> framework is a "flexible evidentiary standard" whose requirements "vary depending on the context"; it is a method for proving cases rather than the definition of a cause of action. <u>Swierkiewicz</u> v. <u>Sorema N.A.</u>, No. 00-1853, 2002 WL 261807, at *4 (U.S. Feb. 26, 2002) (holding that a Title VII plaintiff need not plead the elements of a <u>McDonnell Douglas</u> prima facie case to survive a motion to dismiss).

A.  <u>Direct Evidence</u>

It is generally to an employee's benefit to show direct evidence of discrimination rather than relying on the inferential model set forth in <u>McDonnell Douglas</u>.  If an employee makes a sufficiently strong showing of discrimination using direct evidence, but the employer responds with a showing of legitimate reasons for the actions it took, then the court may view the employer as having mixed motives -- some legitimate, some not.  Under the 1991 Act amending Title VII, the employer may then assert an affirmative defense, bearing the burdens of production and persuasion, that it "would have taken the same action in the absence of the impermissible motivating factor."  Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075-76 (1991), <u>codified</u> <u>at</u> 42 U.S.C. § 2000e-5(g)(2)(B).  On such a showing in a mixed-motive case, the

-7-

employer may then avoid liability for monetary damages and reinstatement. But so long as the employee has shown that the impermissible factor was a motive, even if not the determinative motive, the employer will still be subject to declaratory and limited injunctive relief, as well as attorneys' fees. Id. Although the 1991 Act is silent on exactly what showing is needed to trigger a mixed-motive case, and so might be read to leave open the possibility of a mixed-motive analysis following a sufficiently strong circumstantial showing of discrimination, many courts require an employee to produce direct evidence that establishes discrimination was a motive before employing such an analysis. See generally Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999) (citing Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)).

Employees benefit from presenting such direct evidence for a number of reasons. First, the sheer strength of the evidence may carry the day. Second, it increases the chance of some form of relief, including attorneys' fees. Third, it imposes on the employer the burdens of production and persuasion,[3] unlike the McDonnell Douglas model, which merely

---

[3] This shift occurs, of course, only if the employee has persuaded the fact finder that an impermissible motive has played a part, and the employer is seeking to limit the relief by showing it also acted from permissible motives that would have led to the same action anyway.

-8-

shifts to the employer the burden of producing admissible evidence to support a non-discriminatory reason for its actions. Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996). Fourth, it is more difficult, although not impossible, for the employer to get summary judgment in light of the strength of direct evidence and the potential shifting of burdens. Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429 (1st Cir. 2000); cf. Swierkiewicz, 2002 WL 261807, at *3 ("[A] plaintiff [who] is able to produce direct evidence of discrimination . . . may prevail without proving all the elements of a [McDonnell Douglas] prima facie case."). To obtain these benefits, the employee must "offer stronger evidence . . . than that needed to establish a prima facie case under" McDonnell Douglas. I B. Lindemann & P. Grossman, Employment Discrimination Law 43 (3d ed. 1996).

Much has been written about what is direct evidence. See id. at 40 nn.150, 151 (collecting cases). It is easy to say that there is direct evidence when a decisionmaker says, for example, "I fired you because you became pregnant and took maternity leave." But that rarely happens in this world, where most employers are well aware of the legal consequences of discrimination. And so employees offer other types of statements as "direct" evidence. See Price Waterhouse, 490 U.S.

-9-

at 272 (O'Connor, J., concurring) (treating as direct evidence a statement by the relevant decisionmaker that the plaintiff's "'professional' problems would be solved if she would 'walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry'").

This circuit has made clear that inherently ambiguous statements do not qualify as direct evidence. In Fernandes, we held that the statement "I don't need minorities and I don't need residents on this job" was ambiguous because in context it might have reflected "a benign response to a specific inquiry reflecting [the speaker's] . . . perception that he no longer had to make special efforts to comply with EEO requirements." 199 F.3d at 583.[4] And in Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8 (1st Cir. 1998), we held a store manager's statement that the plaintiff in that case had "a perfect case of age discrimination" did not suffice as direct evidence because there

---

[4] We have further explained this requirement in subsequent cases. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 61 (1st Cir. 2000) ("Comments which, fairly read, demonstrate that a decisionmaker made, or intended to make, employment decisions based on forbidden criteria constitute direct evidence of discrimination. The mere fact that a fertile mind can conjure up some innocent explanation for such a comment does not undermine its standing as direct evidence." (citation omitted)). We also note that the statement in Fernandes, although not direct evidence, when combined with the other evidence in that case enabled the plaintiffs to reach a jury under McDonnell Douglas. 199 F.3d at 588-89.

-10-

was insufficient evidence linking the manager to the actual decisionmaking process for the statement to be admissible. Id. at 13-14.

Weston-Smith offered as direct evidence at summary judgment her testimony about both Neumann's statement regarding Neumann's conversation with Bowles and Bowles's silence at the lunch with Weston-Smith. The district court concluded that Weston-Smith's testimony about Neumann's supposed statement about what Bowles purportedly said is double hearsay and inadmissible. Weston-Smith, 153 F. Supp. 2d at 69. Weston-Smith does not challenge that conclusion on appeal. The appellate issue instead concerns Bowles's silence in the face of Weston-Smith's accusation that Bowles had made the statement to Neumann. The district court held it was of doubtful admissibility and so ambiguous that it could not be considered direct evidence of discrimination or retaliation. Id. at 69-70. The court did not, however, fully resolve the question of admissibility. Id.

This ruling presents a several-part evidentiary question. Weston-Smith argues that the underlying statement -- that Bowles was laid off because of her maternity leave -- is an admission, that Bowles is for this purpose an agent of the Hospital, and that Bowles's failure to respond to Weston-Smith

when accused of making the statement constitutes Bowles's adoption of that admission -- on behalf of the Hospital -- by silence. Weston-Smith could not get the statement into evidence otherwise because Bowles and Neumann deny the encounter. Her argument presents two questions: whether the statement itself met the criteria for the admission of a party-opponent, and if so whether Bowles by her silence adopted that admission at the lunch with Weston-Smith.[5]

We start with the general requirements for an admission. For the statement of an employee to be the admission of a corporate or institutional employer, it must fit within subsection (C) or (D) of Federal Rule of Evidence 801(d)(2), which reads:

> Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement

---

[5]    Weston-Smith's testimony is almost entirely consistent that Bowles said nothing in response to Weston-Smith's questions. She did once, when questioned by counsel for the Hospital, affirm that Bowles had "said she was sorry." That affirmation conflicts with her repeated statements, both earlier and later, that Bowles's response was "[n]ot in words" or was in "body language"; that Bowles "change[d] the subject," and "didn't answer." Even applying the lenient standards of summary judgment, the only reasonable reading of Weston-Smith's testimony as a whole is that Bowles remained silent, and we assess the case on that basis.

-12-

> by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

The statement of an individual defendant may be a direct admission under subsection (A). Bowles is not a defendant; the Hospital is. In order for the statement to be an admission, therefore, Weston-Smith must show through evidence other than the statement itself either that Bowles was authorized by the Hospital to make the statement or that Bowles was the Hospital's agent and the statement concerned a matter within the scope of her employment, made while she was employed. As we discuss below, she must also show that Bowles adopted the statement through her silence in the face of Weston-Smith's accusation.

It is undisputed that the relevant decisionmaker in this case was Melin, the Hospital's President. It is also undisputed that Bowles had held the position of Vice President for Patient Care Services, that her position was eliminated, and that she became one of the five Program Directors, the Program Director of Medical Services. Moreover, there was evidence that

-13-

Bowles was not at all involved in the decision to lay Weston-Smith off: the testimony was that Melin, without discussing the fate of specific individuals, told his management team, including Bowles, about the new overall structure he had in mind; that Melin told her his reasons for putting Neumann into the new position; and that Bowles thus learned that Weston-Smith's position would be eliminated.  Nevertheless, Bowles was Weston-Smith's direct supervisor, and we do not think it is clear that a statement regarding the reasons for Weston-Smith's termination would necessarily be outside the scope of her employment.  Even assuming that the matter was within the scope of Bowles's employment, however, the district court's other reasons for holding Bowles's silence not to amount to direct evidence are solid.

The district court wrote that it was doubtful that Bowles's silence could constitute an adoptive admission, and that if admissible it did not amount to direct evidence. Weston-Smith, 153 F. Supp. 2d at 69-70.  Weston-Smith's theory is that Bowles, by failing to deny the statement that she had told Neumann that Weston-Smith had been laid off because of her maternity leave, adopted that statement.   See generally 2 McCormick on Evidence § 262 (J. Strong et al. eds., 5th ed. 1999) (discussing the doctrine of admission by silence).   The

-14-

trial judge plays a screening role in ruling whether a party (or, as here, its agent) has adopted an admission by silence. In Vazquez v. Lopez-Rosario, 134 F.3d 28 (1st Cir. 1998), we held that "[i]n all [such] cases, the burden is on the proponent to convince the judge that in the circumstances of the case a failure to respond is so unnatural that it supports the inference that the party acquiesced in the statement." Id. at 35 (quoting Ricciardi v. Children's Hosp. Med. Ctr., 811 F.2d 18, 24 (1st Cir. 1987) (quoting J. Weinstein & M. Berger, Weinstein's Evidence § 801(d)(2)(B)[01], at 801-202 n.15 (1985))). In making the evaluation, the trial judge considers the nature of the statement, the identity of the person offering the testimony, the identity of the maker of the statement, the context, and whether the circumstances as a whole show that the lack of a denial is so unnatural as to support an inference that the undenied statement was true.

These circumstances do not meet that standard. It was a social occasion: Bowles had invited Weston-Smith to lunch. Weston-Smith testified that during that lunch, she told Bowles that Neumann had said that Bowles had made the statement to Neumann. The district court correctly concluded that in context there might have been a great many reasons why Bowles was silent on the point and changed the subject, and those other reasons

-15-

made it far from unnatural for Bowles to handle the matter as she did. <u>Weston-Smith</u>, 153 F. Supp. 2d at 69. We add another: Bowles could not know what Neumann had or had not said to Weston-Smith.[6] <u>See</u> 5 <u>Weinstein's Federal Evidence</u> § 801.31[3][d], at 801-58 (J. McLaughlin ed., 2d ed. 2001) ("[A] court may find, after evaluating the type of statement and who made it, that the party could not have been expected to deny it because the party lacked the information necessary to assess its truthfulness.") The silence was not an adoptive admission.

Finally, even if the district court, exercising its discretion, might have concluded that the evidence just barely met the criteria for admissibility, the court was plainly correct to hold that this was not direct evidence. Its probative value is not sufficiently strong. The reasons why Bowles did not respond with a vigorous denial were ambiguous at best, and Bowles was neither involved in the decision nor necessarily aware of the reasons Weston-Smith lost her job. From this conclusion it follows that Weston-Smith must present

---

[6] Further, there is no reason to think that Bowles would know, even as to her own purported statement, whether the statement was true as to the reasons for the layoff. Rather, assuming that she made some statement regarding those reasons, she might have been engaging in speculation about a matter of which she had no personal knowledge. This is particularly plausible because, even on Weston-Smith's version of events, Bowles was speaking to Neumann, not to Weston-Smith.

her case within the burden-shifting framework of <u>McDonnell Douglas</u>.

B.   <u>McDonnell Douglas</u>

The district court found that Weston-Smith's evidence did not create a genuine issue of material fact as to whether the Hospital's articulated legitimate reason for the layoff was a pretext.  <u>Weston-Smith</u>, 153 F. Supp. 2d at 71.  The Hospital's stated reasons justify both Melin's decision to eliminate Weston-Smith's original position and his preference for Neumann over Weston-Smith for the new Surgical Program Director position.

1. The Hospital's reasons

Melin testified as follows. He was responsible both for creating the new management structure resulting from the need to cut staff and for picking the new Surgical Program Director. The Hospital lacked the funds to maintain both a new Surgical Program Director and the Peri-Operative Services Director, the position Weston-Smith held. Weston-Smith's maternity leave had, he said, nothing to do with the elimination of her position. The restructuring affected about 20 jobs, although this number includes some employees who were rehired in new positions, as Neumann was. Employees other than Weston-Smith were laid off, including at least one higher in the organization than she, and other management positions were eliminated.

After the reorganization, Neumann as the new Surgical Program Director assumed all of Weston-Smith's prior responsibilities, plus additional ones. Melin had considered both Weston-Smith and Neumann for the new job, which was in many ways similar to Weston-Smith's old job. He picked Neumann because she, in his view, fit better into the upgraded job, now a part of senior management. Melin thought the difference between the old job and the new one was that the old was a "management role"; the new, a "senior management," or

-18-

"leadership," role requiring "leadership and support from the rest of the organization and a vision for a bigger picture." He had two primary reasons for selecting Neumann. First, he had observed Neumann's leadership skills when she served as chair of the Hospital's successful, recent capital campaign. During that process -- which involved asking employees to contribute to the Hospital's fundraising for a new building even as it laid other employees off -- Melin had seen Neumann build loyalty and morale, and win employee support. Second, he had faced Neumann at the bargaining table. She had been chair of the nurses' collective bargaining unit for a number of years; Melin had seen that she was skilled with budgets and that she could lead. She won his respect.

2. Weston-Smith's response

Weston-Smith argues that a jury could find these reasons to be pretext on several grounds. The elimination of the position to save money, she says, was pretextual because the new job was really her old one without significant changes. Moreover, the total number of positions in her department stayed the same, and the salary of her former job was increased when it became the Surgical Director's job. This argument takes too myopic a view; overall, several management positions were eliminated, so that the reorganization did save the Hospital

money.  That the reorganized jobs encompassed functions of former jobs is unsurprising.  Functions rarely go away; but how functions are handled does change, and changes can lead to greater efficiency.

Weston-Smith is correct that an employer may not try to shield a discriminatory or retaliatory termination by hiding it in a layoff.  Smith v. F.W. Morse & Co., 76 F.3d 413, 422 (1st Cir. 1996) ("Whether or not trimming the fat from a company's organizational chart is a prudent practice in a particular business environment, the employer's decision to eliminate specific positions must not be tainted by a discriminatory animus.").  But there is little, if any, admissible evidence suggesting that the decision to merge Weston-Smith's job function into a higher level job in a streamlined organization was motivated by either retaliation or discrimination.

Weston-Smith's attack on the reasons given for the choice of Neumann over Weston-Smith herself as pretextual is similarly flawed.  Weston-Smith says that Melin's generalized subjective assessments about "leadership" and "vision" to support the creation of a new job and the choice of Neumann are insufficient.  Subjective judgment may mask an improper motive, as Weston-Smith suggests.  Melin's explanation, however, is not

sheer subjectivity. Melin had observed Neumann over a period of years as she successfully performed demanding tasks. These tasks -- heading the capital campaign and the nurses' bargaining unit -- demonstrated Neumann's skills. Absent further evidence of discrimination or retaliation, which Weston-Smith has not produced, there is no reasonable inference of pretext.

Melin's statement that he wanted Neumann on his senior management team must be pretext, Weston-Smith argues, because Weston-Smith was terminated and discouraged from even applying for the new position before Neumann was ever told of or accepted the new position. No reasonable inference of pretext can be drawn from this. Although it was not certain that Neumann would accept, it is improbable that she would decline a position with higher pay on the senior management team, working directly under Melin, whom she knew. Moreover, the Hospital might easily have wished to avoid the awkward situation of informing Neumann, then Weston-Smith's subordinate, of the decision to lay Weston-Smith off before Weston-Smith herself found out.

Weston-Smith also relies on her relative qualifications for the new job compared with Neumann's. She stresses Neumann's testimony that she had no management experience and did not have a masters degree, while Weston-Smith had both. This argument is nothing more than second-guessing Melin's decision about whose

skill set would be more valuable.  That Melin might have decided in Weston-Smith's favor based on her own skills would not permit a jury to infer that his choice of Neumann was either discrimination or retaliation.  Moreover, Weston-Smith places too much emphasis on whether a job was termed "management" and on credentials.  Melin could reasonably look behind labels and degrees, and rely on his own experience with Neumann and observation of her leadership skills, regardless of whether she had played a union or a management role at the time.  That approach does not render his decision so unlikely as to permit, from that and little more, a jury inference of improper motive.

Beyond her attacks on the Hospital's proffered reason, Weston-Smith presents a few more pieces of circumstantial evidence of discrimination or retaliation on the Hospital's part.  These consist of her own testimony that she overheard two doctors complaining about her absence on maternity leave; Neumann's additional testimony that there had been complaints about Weston-Smith's "[l]ack of accessibility" (although not that these complaints were related to the maternity leave); and Bowles's silence, if admissible, in the face of Weston-Smith's accusatory question. As to the testimony of complaints, nothing links those complaints to the decision process; nor do they appear sufficiently pervasive to justify a finder of fact in

inferring such a link.  As to the silence, we have already given the reasons that, if admissible, it has little probative value.

We conclude that Weston-Smith has produced insufficient evidence to take her case to a jury within the <u>McDonnell Douglas</u> framework.  Although her prima facie case is undisputed, the Hospital's proffered reasons for her termination are plausible and coherent, and neither her criticisms of those reasons nor her independent circumstantial evidence of an improper motive, whether taken apart or together, are sufficient to require  a jury trial.  <u>See</u> <u>Zapata-Matos</u> v. <u>Reckitt & Colman, Inc.</u>, 277 F.3d 40, 47 (1st Cir. 2002) ("[A] slight suggestion of pretext, absent other evidence from which discrimination can be inferred, [does not] meet[] plaintiff's ultimate burden.").

### III.

For the reasons given, we <u>affirm</u> the judgment of the district court.  No costs are awarded.