**Yvonne JACKSON, Plaintiff,**

**v.**

**BLUE DOLPHIN COMMUNICATIONS OF NORTH CAROLINA, LLC; American Media Services, Inc.; Edward F. Seeger; Alesa Peace; and Harold Greene, Defendants.**

**No. CIV.1:02 CV 109.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Oct. 22, 2004.

Paul Louis Bidwell, Asheville, NC, Matthew C. Billips, Miller, Billips & Ates, P.C., Atlanta, GA, for Plaintiff.

John Brem Smith, Chase B. Saunders, Robyn W. Madden, McNair Law Firm, P.A., Charlotte, NC, for Defendants and Counter–Defendant.

Paul Louis Bidwell, Asheville, NC, Matthew C. Billips, Miller, Billips & Ates, P.C., Atlanta, GA, for Counter–Defendant.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion for summary judgment. For the reasons stated below, the Defendants' motion is granted in part and denied in part.

### I. VIOLATION OF THE PRETRIAL ORDER AND CASE MANAGEMENT PLAN

The parties uniformly violated the Pretrial Order and Case Management Plan in the briefs submitted in connection with this motion. Pretrial Order and Case Management Plan, filed August 4, 2003, ¶ 5(b) (absent permission from the Court no brief shall exceed 25 pages). The Defendants' brief of 46 pages and the Plaintiff's response of 63 pages were filed without leave of the Court. Counsel are cautioned that if such conduct occurs in the future, they will be sanctioned. Indeed, the volume of pleadings filed in this action have been entirely excessive and unnecessary to an expedient resolution.

### II. PROCEDURAL HISTORY

On May 3, 2002, Plaintiff initiated this action alleging the Defendants discriminated against her on the basis of her race, in violation of 42 U.S.C. §§ 1981 and 2000e, *et seq.*, conspired to retaliate against her for her refusal to make a false affidavit, in violation of 42 U.S.C. § 1985, intentionally inflicted emotional distress, terminated her in violation of North Carolina's public policy, engaged in a state law civil conspiracy and obstructed justice. Complaint, filed May 3, 2002. On October 8, 2002, the undersigned dismissed the Plaintiff's claims based on conspiracy pursuant to 42 U.S.C. § 1985, civil conspiracy and intentional infliction of emotional distress. Order, filed October 8, 2002.

### III. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra*). "Regardless of whether [she] may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of her pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered." *Id.* (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)) (other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. STATEMENT OF FACTS

Defendant Blue Dolphin Communications of North Carolina, L.L.C. (Blue Dolphin) was created by Defendant Edward Seeger (Seeger) in September 1996 to operate as a radio broadcast company in Western North Carolina. Declaration of Edward F. Seeger, Sr., *attached to* Defendants' Memorandum in Support of Motion for Summary Judgment ["Defendants' Memorandum"], filed June 22, 2004, ¶ 1. Seeger was the station's president and owner until December 2001 when it was sold to Clear Channel Communications. *Id.*, ¶ 5. The radio station operated with the call letters of "WMXF." Declaration of Dawn Creasman, *attached to* Defendants' Memorandum, ¶ 1. The Plaintiff was employed by Blue Dolphin in Marion, North Carolina, in October 1996 as a traffic assistant. Defendants' Exhibit 5, *attached to* Defendants' Memorandum; Exhibit 8, Excerpts from the Deposition of Edward Frank Seeger, Sr., *attached to* Plaintiff's Appendix in Response to Defendants' Motion for Summary Judgment ["Plaintiff's Appendix"], filed July 13, 2004, at 43. In this position, she was responsible for scheduling commercials which had been sold by the advertising salespeople to play on the air at the correct time. Creasman Declaration, *supra*, ¶ 6. She also entered contracts for that advertising into the computer system, sent out invoices and bills in connection with the advertising, and assisted in the production of a morning show. Exhibit 6, Excerpts from the Deposition of Yvonne Jackson, *attached to* Plaintiff's Appendix, at 63. During 1998 and 1999, Blue Dolphin performed so badly that Seeger

determined to consolidate its stations and eliminate the Marion office. Seeger Declaration, ¶ 24. At least two white employees were terminated during this time period for financial reasons. *Id.* The Plaintiff, however, was not terminated but was allowed to transfer to the Asheville office in the summer of 1998 with the same job. *Id.;* Plaintiff's Deposition, at 64. This was a transition for the Plaintiff because the Marion office had only two or three employees without a manager. Seeger Deposition, *attached to* Defendants' Memorandum, at 43, 45. In the Marion office, the Plaintiff had been "her own boss and reported to me when I came through town about every other week." *Id.* Because the transfer required the Plaintiff to commute to Asheville, North Carolina, she was given a raise. *Id.,* at 43.

Defendant Alesa Peace (Peace) and her husband owned Blue Dolphin along with Defendant Seeger. Exhibit G, Excerpts from the Deposition of Alesa Peace, *attached to* Defendants' Memorandum, at 1–20. In early 1999, Peace received telephone calls from several employees at the Asheville station during which complaints of irregularities were made against Rennold Madrazo, the general manager. *Id.,* at 55–56. The Plaintiff, who was one of those employees, complained that Madrazo used foul language and screamed in the office. *Id.,* 56, 64. On investigation, Peace learned that Madrazo had been making trades without authorization which caused the station to lose money. *Id.,* at 56. Such trades involved the use of services provided by companies which would normally pay for advertising. In exchange for advertising, the company would provide a service, such as meals at restaurants and rooms at hotels. When Madrazo learned that Peace was going to investigate the situation, he attempted to enlist employees to cover up his conduct. *Id.* Peace was advised by one of her partners,

who also was an attorney, to type the information provided by employees in the form of affidavits which were then presented to the employees for their signatures. *Id.,* at 59–62.

Matthew Cole was one of the employees who signed an affidavit concerning Madrazo's performance. Affidavit of Matthew Cole, *contained in* Defendants' Exhibit 7, *attached to* Defendants' Memorandum. Cole, who was an on-air announcer, averred that Madrazo did not work full time, lacked leadership and pitted employees against each other. *Id.* The Plaintiff notarized his signature. *Id.* Chris Hoffman was a sales manager and averred that Madrazo lacked leadership and focus. Affidavit of Chris Hoffman, *contained in* Defendants' Exhibit 7, *supra.* His signature was notarized by the Plaintiff. *Id.* Karen Birchfield, who was a bookkeeper, averred that Madrazo used loud, foul and obscene language which embarrassed her. Affidavit of Karen Birchfield, *contained in* Defendants' Exhibit 7, *supra.* He made faces to imitate and humiliate employees, made derogatory comments about employees to other employees, and created a "back-stabbing" environment. *Id.* The Plaintiff also notarized Birchfield's signature. *Id.* Jeannie Summerlin reiterated Birchfield's comments about Madrazo's language and added that he had sexually harassed her. Affidavit of Jeannie Summerlin, *contained in* Defendants' Exhibit 7, *supra.* He allowed his wife to drive a car leased by the station, falsified monthly expense reports for reimbursement for personal items not related to business, and traded air time for services used by his family. *Id.* Once again, the Plaintiff notarized the signature. *Id.* In April 1999, Peace also prepared an affidavit for the Plaintiff's signature which contained the complaints made by the Plaintiff about Madrazo. Peace Deposition, at 64. The

Plaintiff did not sign the affidavit. She continued to be employed by Blue Dolphin after she did not sign the affidavit until the end of July 1999.

After Madrazo's termination, Peace discovered that certain contracts for advertising with the station had been deleted from the computer system. *Id.*, at 89. This meant that the customer received air time advertising but was not billed by the radio station because Madrazo had "traded" services with the customer to the detriment of the station. *Id.* When Peace asked the Plaintiff, whose job was to enter those contracts into the computer, about the deletions, the Plaintiff admitted that Madrazo had asked her to help him "cover up" his scandal. *Id.*, at 89–91. The Plaintiff also admitted this to Seeger. Seeger Deposition, *supra*, at 58. Both Peace and Seeger believed that the Plaintiff did this because she had been participating in the scheme and had received goods herself. Peace Deposition, *supra*, at 166–67. However, they did not terminate the Plaintiff's employment at that time.

In March 1999, Defendant Harold Green was hired to replace Madrazo as the general manager. *Id.*, at 53. Because Matthew Cole was an announcer, he had daily contact with Green. Deposition of Matthew Cole, filed June 13, 2004, at 12. Green frequently asked Cole what was wrong with the Plaintiff and described her has "standoffish." *Id.* Green made comments to the effect that "[t]hose kind of people are lazy" and disorganized. *Id.* Cole testified that although the Plaintiff did stay in her office rather than socializing with co-workers, she was approachable. *Id.* Cole, who found the Plaintiff's job performance to be excellent, assumed that the reference to "those kind of people" was a racial reference. *Id.*, at 13. Most of the time, Cole's interaction with the Plaintiff was limited to between 15 and 30 minutes

a day. *Id.*, at 27. On one occasion, while discussing Cole's upcoming show, Green made the comment that he admired the oratorial skills of Adolph Hitler and was mesmerized by him. *Id.*, at 15. Cole recalled a meeting during which three co-workers of the Plaintiff, Brenda Chancey, Dawn Creasman and Chris Hoffman, complained to Green that she was uncooperative and hard to get along with. *Id.*, at 30–31. Those individuals also stated that the Plaintiff had a bad attitude. *Id.*, at 32–33. In response, Green replied that he would love to fire the Plaintiff but she was black and that made it difficult to terminate her. *Id.* Cole, who admitted that he left the station because of his personal dislike for Green, testified that he thought Green meant by that comment that he did not like the Plaintiff because of her race, wanted to fire her, and had to be careful of the manner in which he did so. *Id.*, at 30, 32. Cole also testified that he heard that the Plaintiff's job was being phased out because there was not enough work for her. *Id.*, at 38.

Brenda Chancey testified that the Plaintiff was terminated due to job performance rather than race. Exhibit 10, Excerpts from the Deposition of Brenda Chancey, *attached to* Plaintiff's Appendix, at 47; Exhibit C, Excerpts from the Deposition of Brenda. Chancey attached to Defendants' Motion, at 39. The Plaintiff was disorganized and her office was "a mess." Exhibit 10, *supra*. Although Chancey did not know the specific reason for the Plaintiff's termination, she testified that "there was always controversy surrounding her." Exhibit C, *supra*. The Plaintiff was a troublemaker who could not get along with Karen Birchfield and she aligned herself with Matt Cole. *Id.* "[E]verybody just thought we were kind of better off that she was gone because she had this kind of negative aura around her." *Id.* She also made her own hours which annoyed others

in the office, especially when she came in late in the morning. *Id.* The Plaintiff was the exact opposite of Karen Birchfield who was "very detailed and very on top of things[.]" *Id.,* at 47. Both Birchfield and the new general manager thought that the Plaintiff did not have enough work to justify her position. *Id.,* at 48. After she was terminated, there was no replacement hired for her position. *Id.*

Jeanette Summerlin worked as a receptionist at the radio station. She testified that Hal Green once asked her why the Plaintiff kept to herself. Deposition of Jeanette Summerlin, filed June 13, 2004, at 13. He made the comment that he understood how black people felt and that the Plaintiff was uncomfortable because she was the only black person working at the station. *Id.* Green also told Summerlin that he had worked with a black woman in Washington, D.C., and had trouble getting along with her until one day when they had a confrontation and resolved their differences. *Id.,* at 14–15. On another occasion, Green stated to Summerlin that the Plaintiff was a remnant of Madrazo's tenure at the station and he thought she lied about things. *Id.,* at 16. Summerlin testified that the station was full of backstabbing and gossip among the employees. *Id.,* at 16–17. Summerlin also opined that the station had constant turn over in employees because they frequently quit after working there for a while. *Id.,* at 32. Green told Summerlin on one occasion that an employee had reported to him that the Plaintiff had been seen shopping during the work day instead of fulfilling her duties at the office. *Id.* Summerlin testified that Green later admitted that no one had reported it to him; it was his opinion that the Plaintiff did personal things on company time. *Id.,* at 18. Green also asked Summerlin and Birchfield on one occasion whom they most admired in history. *Id.,* at 19–20. While they both an-swered Jesus Christ, he stated that he admired Hitler although he knew he was "an evil, evil man, he said, [he] could sit and listen to him speak for hours. What an orator he [was]." *Id.,* at 20. One day Summerlin picked up a magazine in the waiting area of the station. *Id.,* at 24–25. Matt Cole was standing next her and they both noticed a photograph of a beautiful black woman on the cover. *Id.* Green walked past, noticed the photograph, and commented "She's beautiful, but I bet she's mean." *Id.* Matt commented that he thought Green had been "really burned by a black female." *Id.* Summerlin overheard a confrontation between the Plaintiff and Chris Hoffman on one occasion. *Id.,* at 36. Dawn Creasman and the Plaintiff never got along. *Id.* On another occasion, there was an altercation among the Plaintiff, Creasman and Birchfield during which the Plaintiff called Birchfield a "backstabber" after which the two women stepped outside the office because their voices were so loud. *Id.,* at 37.

Dawn Creasman was employed by Blue Dolphin from the summer of 1997 through June 2003 as an on-air personality and a sales account executive. Creasman Declaration, *supra.* In her position, Creasman was obligated to work with the Plaintiff, who was responsible for preparing reports for the use of sales executives. *Id.* The Plaintiff was frequently unresponsive to repeated requests by the sales staff for such reports and was generally unorganized, sloppy and uncooperative. *Id.,* ¶ 9. In addition, the Plaintiff had a very bad temper which she rarely controlled. *Id.,* ¶ 10. Creasman averred that she had

personally heard Ms. Jackson threaten to "kick my white ass." Her tone of voice was extremely harsh and ugly. This threat was related to an advertisement for a fast-food restaurant. This restaurant signed an annual cont[r]act

for radio advertisement. The restaurant paid to begin the advertisement the next day. I was instructed by the general manager to tell Ms. Jackson to get the advertisement on the air for play the next day. Ms. Jackson then replied that "I had my head up the General Manager's white ass." Ms. Jackson failed to start the advertisement on the day specified in the contract. When I confronted Ms. Jackson and asked why the advertisement did not run, she became belligerent and told me that she was going to "kick my white ass."

Ms. Jackson's behavior was unprofessional and many times bordered on violent. [D]uring a sales meeting, Ms. Jackson stormed into the meeting stating that she was going to "kick someone's mother fucking ass." ... On one occasion, I heard Ms. Jackson arrogantly state that the radio station could not fire her because she was black.

*Id.,* ¶¶ 11–13.

Karen Birchfield was the business manager for Blue Dolphin from 1997 until 2001. Exhibit D, Excerpts from the Deposition of Karen Birchfield, *attached to* Defendants' Memorandum, at 15. On four separate occasions, Birchfield recommended to Green that white employees be terminated for lack of job performance. *Id.,* at 16–21. One of those employees was a white woman who had been doing the same job as the Plaintiff. *Id.,* at 20. In fact, when the white employee was terminated, the Plaintiff was allowed to take over her job. *Id.,* at 30. During a period of consolidation in 1998, the station chose to fire a white female and retain the Plaintiff. *Id.* Two or three other employees were terminated during the time the radio station consolidated its operations. *Id.,* at 31. At that point in time, the Plaintiff was much more flexible and willing to take on a new method of performing the traffic work. *Id.* Birchfield was also aware of other terminations of white employees for bad job performance. *Id.,* at 29. Birchfield was aware of the Plaintiff's job performance, particularly since part of Birchfield's job was to do trafficking for a different station. *Id.,* at 38. The same job function that Birchfield could perform in 45 minutes would take the Plaintiff all day. *Id.* The Plaintiff also failed to send out bills in a timely manner. *Id.,* at 42. Some bills were sent out for the first time 120 days after the account was incurred. *Id.* At that time, the Plaintiff would receive a commission if she collected an account that was over 120 days old. *Id.,* at 43. As a result, she simply failed to send the bill at all until it was already over 120 days old. *Id.* This allowed the Plaintiff to collect the commission; however, customers began to complain because they were being charged late fees on the first bill they received. *Id.* On one occasion, the Plaintiff became angry with Birchfield and called her "a bitch" and "threatened to kick my ass." *Id.,* at 46. Birchfield heard the Plaintiff use loud and profane language on other occasions towards other employees. *Id.* After Summerlin told Birchfield of some discrepancies in expense accounts, Birchfield investigated and discovered the "trading" scheme used by Madrazo and she reported her findings to Alesa Peace. *Id.,* at 54. The scheme worked because the Plaintiff would run commercials for a business which was never billed for the air time. *Id.,* at 59. Instead, either Madrazo or the Plaintiff, or both, would receive goods from the business in exchange for the air time. *Id.* The Plaintiff would then destroy any information about the commercials. *Id.* Birchfield discovered this by comparing a log which showed which commercials had run during a given month with billing reports. *Id.* The billing reports did not show contracts for

certain commercials which had in fact aired. *Id.*

> She would take a contract from the general manager (Madrazo). She would enter into the traffic computer and schedule the commercials to play. Then after they had played and the client had gotten their end of it, which was the air play on the radio station, air time, she would remove those commercials from the computer's history, and ... she would print a bill that the client would get, but remove it before the billing reports were run.

*Id.,* at 60. In this way, goods were traded for the air time but the station was never paid for the air time. The Plaintiff was frequently late for work and early to leave. *Id.,* at 62. In fact, "[s]he kept her own hours, is what we all said." *Id.* After the Plaintiff was terminated, Birchfield took over her job duties which took her only about an hour a day to perform. *Id.,* at 64. The station did not replace the Plaintiff. *Id.* Birchfield advised Green that, in her opinion, the Plaintiff should be terminated for poor job performance. *Id.,* at 66. She was not the only employee, or the first, whose termination had been recommended by Birchfield. *Id.,* at 16–31. While Birchfield chose to sign an affidavit about Madrazo, she did not feel pressured to do so. *Id.,* at 67. "If we wanted to sign it, we were welcome to. If we didn't feel comfortable, we didn't have to." *Id.* On one occasion, Summerlin reported to Birchfield that the Plaintiff had gone shopping on company time. *Id.,* at 68. On another occasion, Summerlin complained to Green because the Plaintiff was late coming to work. *Id.,* at 70. Green defended the Plaintiff and explained that she had worked late the day before. *Id.*

Hal Green testified that Dawn Creasman told him that the Plaintiff had been shopping on company time. Deposition of Harold Green, filed June 13, 2004, at 65–66. He confronted the Plaintiff about the incident and she became angry, yelled at him and left his office slamming the door. *Id.,* at 66–67. Chris Hoffman, who was the sales manager, also complained about the quality of the Plaintiff's work. *Id.,* at 69. As the Plaintiff become more confrontational, Green spoke with her and told her not to have a chip on her shoulder. *Id.,* at 104. That comment was made in an attempt to move her forward to a positive attitude and to be less defensive. *Id.,* at 105. Green also explained the comments made about Hitler.

> [W]hen I got [to the station], [Matt Cole] came to me with a yellow pad full of pages of why he should be my assistant. I said, "I don't know you yet, Matt, I'll see." Matt was on the air and I had heard him, he was very reckless. He would go on the air and recommend to our listeners not to pay their income tax. You don't need to pay your income tax. You don't need a driver's license. He would say something about a newsperson on Channel 13 with a black woman and he would, with kind of a smirk, talk about her being a lesbian on the air. I put a stop to that and he was edited. But before that happened I would have long conversations with him trying to feel him out, trying to see, because he has some talent, trying to see if he would be worth keeping. In the conversation we got to talking about on the air, voices, dictions, speaking, effectiveness; those things and he said, "Well, you know, I've heard some good speakers." I said, "Yeah, so have I," and three come to mind especially, that I can think are particularly effective speakers. Public speakers. One was Franklin Roosevelt. The other one was Martin Luther King. The third one, while I didn't understand a word he said and he was a horrible man, I think he was

Satan-possessed, was Adolph Hitler. You watch him on those news clips and he had hundreds of thousands of people enthralled—incredible speaker, dangerous. Matt Cole twisted that into I was a Hitler lover.

*Id.*, at 112–15.

Green also testified that the other employees resented the fact that although the Plaintiff had very little work to do, she would not pitch in to help them when they needed additional assistance. *Id.*, at 176–78. She was not a team player; he had more than one conversation with her about this, her attitude, and her unwillingness to stay late if someone needed help. *Id.* Early in his new tenure as the general manager, someone put candy in the Plaintiff's file in order to make it look as if she had stolen it from the station. Green held a staff meeting and "chewed out" all the employees and threatened to fire the person responsible. *Id.*, at 62–63, 256–57, 260. Green felt that the other employees did not like the Plaintiff because of her attitude, her lack of performance, her tardiness, her slamming of doors and her general behavior. *Id.*, at 261. Green did not feel that her race had anything to do with how she was perceived. *Id.* Green also denied making comments such as "blacks don't belong with whites." *Id.*, at 279.

When Green came on board as general manager, the Plaintiff had almost no work to do because the station was doing so poorly that there were no commercials for her to log in. *Id.*, at 41. He perceived her to be a bright and friendly woman and offered additional work to her in order to improve her position. *Id.*, at 48–49. He thought she would work well in public relations and collections. *Id.* However, due to the lack of advertising, her work load did not increase. *Id.*, at 156. Dawn Creasman was particularly annoyed with the Plaintiff's work habits because the Plaintiff frequently talked on the telephone with friends, came in late to work, came and went as she pleased, and frequently injected racial issues into any conversation. *Id.*, at 57. The Plaintiff was constantly on the defensive and ready to do battle over the smallest issues. *Id.*, at 58. After the Plaintiff's termination, Birchfield performed her job for some years before the station became busy enough to hire part-time help. *Id.*, at 39. Green denied making any comment about a photograph of a black woman on a magazine. *Id.*, at 266.

The Plaintiff testified that on the Friday before Mother's Day in May 1999, she had a conversation with Green during which he told her that she did not belong at the station because she was black, "blacks do not belong with whites," she was "the poison left behind from" Madrazo, and she thought she was invincible because she was a black female. Exhibit 6, Excerpts from the Deposition of Yvonne Jackson, *attached to* Defendants' Memorandum, at 34–35. She reported this to Seeger and Alesa Peace. *Id.* Although Peace was very sympathetic, nothing was ever done.[1] *Id.*, at 40. At a staff meeting in April 1999, the Plaintiff admits that she "said if I find out who's trying to set me up, I will kick your ass, or I will get someone else to do it for me." *Id.*, at 53–54. Green was present at that meeting and the Plaintiff admitted that he took her side. *Id.* He told the staff that she "had a right to be upset and that he was going to get to the bottom of it and try to find out who was trying to set me up." *Id.* He defended her and said he did not believe she would steal things. Green.

---

1. Both Peace and Seeger denied that the Plaintiff had ever complained to them about

*Id.* The Plaintiff testified that during a conversation in which he asked her to resign, he also mentioned his admiration for Hitler. *Id.*, at 79–80. She was offended by this comment because during the Olympics held in Germany, Hitler did not want African Americans to compete. *Id.* She never heard any other employee at the station make racial remarks or slurs. *Id.* In fact, the Plaintiff admitted that she had been the only black person working at the station since 1996 and it had never been an issue. *Id.*, at 110. The Plaintiff acknowledged that she was given the opportunity to earn commissions by the collection of past due accounts. *Id.*, at 95. She denied that she was ever late to work or left work early. *Id.*, at 97. She acknowledged that she had difficulty getting along with Creasman and Chancey. *Id.*, at 102–03, 112. And, she acknowledged having had a disagreement with her previous manager, Madrazo. *Id.*, at 112. Although Green asked her more than twice to sign the affidavit concerning Madrazo, he never threatened any disciplinary or other action if she did not do so. *Id.*, at 184–85. Although Seeger also telephoned her a couple of times and asked her to sign the affidavit, he also did not threaten any disciplinary or other action. *Id.*, at 186. The same was true of Peace. *Id.*, at 188.

The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in which she claimed that when she refused to sign an affidavit concerning Madrazo, Green

> accused me of being an instigator, a troublemaker, the "poison" in the station, of having a "chip on my shoulder," and of segregating myself because I am the "only one here" ... the "only black here." He told me, "You think you are invincible because you are a black female." ·When I reacted with tears to the general manager's tirade, he invited me to quit and told me I did not have to

stay.... On July 30, 1999, I was terminated from employment by the general manager.... I believe I was discriminated against and terminated because of my race and color, in violation of Title VII of the Civil Rights Act of 1964 and because of my refusal to provide false testimony.

Exhibit 5, *attached to* Defendants' Memorandum.

██ In her complaint, the Plaintiff alleged that the Defendants discriminated against her "in the terms and conditions of her employment and terminated [her] employment because of her race[.]" Complaint, at 8.

## V. DISCUSSION

### A. Plaintiff's claim pursuant to Title VII, 42 U.S.C. §§ 2000e, *et seq.*

Before a plaintiff has standing to file suit under Title VII, [she] must exhaust [her] administrative remedies by filing a charge with the EEOC. The EEOC charge defines the scope of the plaintiff's right to institute a civil suit. "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." In the present case, [Plaintiff's] *EEOC charge* alleges that [Defendants] discriminated against [her and terminated her] based upon [her] race. [Plaintiff's] *complaint* alleges that [Defendants] discriminated against [her in the terms and conditions of her employment] based upon [her] race[.] ... Administrative investigation of [terms and conditions of employment], however, could not reasonably be expected to occur in light of [Plaintiff's] sole charge of race discrimi-

nation [and termination], and the investigation of the complaint did not touch on any matters other than race discrimination [and termination]. Therefore, because the scope of [Plaintiff's] complaint exceeds the limits set by the allegations of [Plaintiff's] administrative complaint, [this Court] cannot analyze the merits of [her terms and conditions of employment] claims.

*Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 132 (4th Cir.2002) (quoting *Chisholm v. U.S. Postal Serv.,* 665 F.2d 482, 491 (4th Cir.1981)) (other citations omitted); *accord, Kess v. Municipal Employees Credit Union of Baltimore, Inc.,* 319 F.Supp.2d 637, 644 n. 12 (D.Md.2004); *Crippen v. P. Flanigan & Sons, Inc.,* 1994 WL 146419 (D.Md.1994) (EEOC charge limited to discharge in retaliation for protected activity and race limited Title VII complaint and claims based on terms and conditions of employment could not be heard.).

Here, the EEOC charge was limited to termination on the basis of race and refusal to sign an affidavit. The complaint goes beyond those allegations to claim disparate treatment in the terms and conditions of her employment. The Plaintiff is, therefore, limited in connection with her Title VII claim to the scope of her EEOC charge, *i.e.,* discriminated against and terminated based on race. There is no claim for discrimination in the terms and conditions of employment.[2] *Bryant, supra;*

2. Although the EEOC charge makes allegations based on color, the complaint correctly omits any mention thereto because no such claim is extant in the case.

Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African–American individual is discriminated against in favor of a light-colored African–American individual. In [her] EEOC complaint, [Plaintiff] did not indicate that [s]he was discriminated

*Edelman v. Lynchburg College,* 300 F.3d 400, 405 (4th Cir.2002); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 n. 4 (4th Cir.2001). To the extent the Plaintiff seeks to show harassment or a hostile work environment, the same ruling precludes any such claims.[3] This ruling does not apply, however, to the Plaintiff's claims pursuant to 42 U.S.C. § 1981.

## B. Plaintiff's Title VII claims against American Media Services, Inc. (American Media), Edward Seeger (Seeger), and Alesa Peace (Peace)

 Title VII precludes a plaintiff from stating a claim against any defendant not named as a respondent in an EEOC charge. Here, the Plaintiff's EEOC charge named only Blue Dolphin and Green. *Onan v. County of Roanoke, Va.,* 52 F.3d 321 (table), 1995 WL 234290, *2 (4th Cir.1995). As a result, any claims pursuant to Title VII against American Media, Seeger and Peace must be dismissed.

## C. Plaintiff's § 1981 claims against Seeger, Peace and American Media

 "Individual supervisors ... cannot be liable under § 1981 unless 'they intentionally cause [an employer] to infringe the rights secured by section 1981.'" *Luy v. Baltimore Police Dept.,* 326 F.Supp.2d 682, 688 (D.Md.2004) (quoting *Carson v. Giant Food, Inc.,* 187

against on the basis of [her] skin color. Rather, [Plaintiff's] allegations in [her] EEOC charge form and [her] complaint focus exclusively on [her] race and are devoid of any hint that [her] particular skin tone motivated the alleged discrimination. *Bryant, supra,* at n. 5 (citations omitted).

3. However, the Defendants moved for summary judgment as to this issue and the Plaintiff failed to make any response. As a result, the motion will be granted.

F.Supp.2d 462, 483 (D.Md.2002)) (other citations omitted). While the Plaintiff alleges that Peace and Seeger were involved in the decision to terminate her, she does not allege that either Peace or Seeger were involved with racial discrimination. In fact, the Plaintiff admitted that no one at the station ever engaged in racial slurs except Defendant Green. *Behnia v. Shapiro*, 961 F.Supp. 1234, 1237 (N.D.Ill.1997) (individual liability under § 1981 attaches only where the individual himself participates in the discrimination). The Plaintiff has brought forth no evidence that Seeger and Peace intentionally caused Green to discriminate against the Plaintiff on the basis of her race or for her failure to sign an affidavit. *Davis v. Durham Mental Health Dev. Disabilities Substance Abuse Area Auth.*, 320 F.Supp.2d 378, 410 (M.D.N.C.2004) ("These conclusory allegations come with no factual support to sufficiently link Defendants [Seeger] and [Peace] to the alleged discriminatory firing of Plaintiff[.]"); *accord, Disher v. Weaver*, 308 F.Supp.2d 614, 624 (M.D.N.C.2004).

In her brief, Plaintiff states that her "race discrimination claims against American Media Services are brought on the basis that Seeger and Peace were acting as agents of AMS in their role in the decisions at issue in this case." Plaintiff's Response, at 55. Since the Plaintiff has failed to bring forth any evidence from which a reasonable jury could find that Seeger and Peace intentionally caused Green to discriminate against her, no claim pursuant to § 1981 against America Media may survive.

**D. Plaintiff's claims against Blue Dolphin and Green pursuant to 42 U.S.C. § 1981 and Title VII**

■ The framework for proof is the same under either 42 U.S.C. § 1981 or

Title VII. *Bryant v. Aiken Regional Med. Cen., Inc.*, 333 F.3d 536, 544 n. 3 (4th Cir.2003), *cert. denied*, 540 U.S. 1106, 124 S.Ct. 1048, 157 L.Ed.2d 891 (2004). As a result, the claims pursuant to both statutes will be considered simultaneously.

Discrimination may be shown by direct evidence of discriminatory intent or through use of the *McDonnell Douglas* [4] test. Here, the Plaintiff argues that Green's comments constitute direct evidence of discriminatory intent, thus establishing a *prima facie* case. *Swierkiewicz v. Sorema NA*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[A] plaintiff [who] is able to produce direct evidence of discrimination ... may prevail without proving all the elements of a [*McDonnell Douglas*] prima facie case.").

Some years ago the Supreme Court set up two different models for analysis of employment discrimination cases, depending on whether an employee presented direct evidence of discrimination or relied solely on circumstantial evidence.... It is generally to an employee's benefit to show direct evidence of discrimination rather than relying on the inferential model set forth in *McDonnell Douglas*. If an employee makes a sufficiently strong showing of discrimination using direct evidence, but the employer responds with a showing of legitimate reasons for the actions it took, then the court may view the employer as having mixed motives—some legitimate, some not. Under the 1991 Act amending Title VII, the employer may then assert an affirmative defense, bearing the burdens of production and persuasion that it "would have taken the same action in the absence of the impermissible moti-

---

4. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

vating factor." [5] On such a showing in a mixed-motive case, the employer may then avoid liability for monetary damages and reinstatement. But so long as the employee has shown that the impermissible factor was a motive, even if not the determinative motive, the employer will still be subject to declaratory and limited injunctive relief as well as attorneys' fees.

 \* \* \* \* \* \*

Employees benefit from presenting such direct evidence for a number of reasons.... [I]t imposes on the employer the burdens of production and persuasion, unlike the *McDonnell Douglas* model, which merely shifts to the employer the burden of producing admissible evidence to support a non-discriminatory reason for its actions.... [I]t is more difficult, although not impossible, for the employer to get summary judgment in light of the strength of direct evidence and the potential shifting of burdens.

*Weston–Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64–65 (1st Cir.2002) (other citations omitted) (footnote added). The Fourth Circuit has required that such direct evidence be " 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' " *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir.2004) (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995)).

Here, the direct evidence takes several forms, the admissibility of some of which is questionable. Matt Cole "assumed" that when Green spoke of the laziness of "those kind of people," Green referred to the Plaintiff's race. Providing that Cole's inner assumptions would be admissible, the comment remains ambiguous and an inherently ambiguous statement does not qualify as direct evidence. *Weston–Smith*, 282 F.3d at 65; *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir.), *cert. denied*, 540 U.S. 1073, 124 S.Ct. 922, 157 L.Ed.2d 742 (2003) (finding the following comment did not establish discriminatory prejudice: "That's what you people always say when you screw up[.]"). Cole also "assumed" that Green's "Hitler comments" were indicia of racial prejudice. But statements by those making the decision to terminate an employee which are unrelated to the decisional process itself do not suffice to satisfy the burden of proving discrimination. *Hill*, 354 F.3d at 286. The "Hitler comments" were made totally outside any context involving the Plaintiff's performance. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (supervisor's comment to co-worker that "he was never going to send a female to the [Police] Academy" while proof of discriminatory attitude against women did not bear directly on the contested employment decision; thus, mixed-motive standard of review not triggered); *Williams v. New York City Police Dep't*, 1997 WL 557296 (S.D.N.Y.1997) (supervisor's persistent requests to discuss Hitler with black female officer not discrimination). Green himself did not dispute that he noted it was difficult to fire the Plaintiff due to her race. Again, this is an inherently ambiguous statement clearly capable of more than one interpretation. *Weston–Smith, supra.*

**5.** "Although Congress amended only Title VII and not § 1981, [courts in the Fourth Circuit have] continue[d] to treat claims under each statute as analogous. Courts have analyzed Title VII and § 1981 claims under the same framework since *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), even though the mixed motives amendment was made to Title VII alone." *Disher v. Weaver,* 308 F.Supp.2d 614, 622 n. 4 (M.D.N.C.2004).

Summerlin, who complained about the Plaintiff's performance to Green, nonetheless testified during her deposition that the Plaintiff was an excellent employee and opined that Green was prejudiced. *Bryant,* 288 F.3d at 134–35 (subjective beliefs and unsupported speculation insufficient to defeat summary judgment); *King,* 328 F.3d at 149 (co-workers' opinion is not an expert opinion as to performance). Green commented to Summerlin that he understood how the Plaintiff must feel as the only African American working at the station. Although Summerlin opined that this showed his prejudice, the comment is equally supportive of his testimony that he tried to help the Plaintiff. *Bryant, supra; Williams, supra* ("While courts can and do labor to protect parties' rights to work in an environment free of racial intimidation and verbal abuse, I am not certain that it would not violate the First Amendment for the courts to bar any discussion of racial issues in the workplace, even when the discussion is not accompanied by any sort of insulting or threatening remarks."). Indeed, the Plaintiff herself admitted that when Green first came to the station, he stood up for her and was fair to her. Green reported to Summerlin that when he worked in Washington, D.C., he had a similar problem with an African American woman; however, he was able to work it out with her by direct conversation. Again, this comment is consistent with his other attempts to talk to the Plaintiff about her problems getting along with her co-workers. Although Green denied making the comment, both Cole and Summerlin claim he opined that a photograph of a black model showed a beautiful woman whom he "bet" was "mean." *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 548–4 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (derogatory remarks may be direct evidence of discrimination; however, they must not be ambiguous, abstract or unrelated to the employee in question). Cole's reaction to that comment, however, was not that Green was prejudiced but that he had been "burned" by an African American woman.[6]

■ However, the Plaintiff testified that Green had on one occasion told her blacks and whites do not belong together and that one of her problems was that she felt that, as a black woman, she was invincible. And during her termination interview, Green brought up the name of Hitler. Assuming *arguendo* that such comments were made, the issue is whether these uncorroborated statements " 'both reflect directly the alleged discriminatory attitude and [ ] bear directly on the contested employment decision.' " *E.E.O.C. v. Warfield–Rohr Casket Co., Inc.,* 364 F.3d 160, 163 (4th Cir.2004) (quoting *Fuller, supra* ); *Hill,* 354 F.3d at 286.

[T]here is no requirement that an employee's testimony be corroborated in order to apply the mixed-motive framework. Lack of corroboration relates only to the credibility and weight of the evidence, which are issues for the jury. Thus, the mixed-motive framework is applicable here. Under the mixed-motive framework, the [Plaintiff] "need not demonstrate that [Plaintiff's race] was the sole motivating factor to prevail, so long as it was a motivating factor." In other words, "it is sufficient for the [Plaintiff] to demonstrate that [Green] was motivated to take the adverse employment action by both permissible and forbidden reasons." If the [Plaintiff] makes this showing, [Defendants] can nonetheless avoid liability by proving

6. Used in this context, the term "burned" would connote that Green had been emotionally harmed or become angry with such a person. *Merriam–Webster Dictionary.*

that [they] would have terminated [the Plaintiff] even in the absence of a discriminatory motive. There is no question that [Green's] alleged statements to [the Plaintiff] ... would support a jury finding that [the Plaintiff's race] was a motivating factor in [Green's] decision to terminate [her]. Thus, [Defendants are] entitled to summary judgment only if the record demonstrates as a matter of law that the company would have terminated [the Plaintiff] even if [they] had not considered [her race].... Based on [the] evidence, a jury could reasonably conclude that, notwithstanding [the Defendants'] financial problems, the company would not have terminated [the Plaintiff] if [her race] had not been a consideration.

*Warfield–Rohr,* at 164–65 (quoting *Hill, supra,* at 284) (other citations omitted). Thus, the mixed-motive portion of the Plaintiff's claim survives summary judgment. The same cannot be said, however, as to any claims reviewed pursuant to the *McDonnell Douglas* scheme.

> To establish a *prima facie* case of racial discrimination ... under Title VII, [Plaintiff] must show that: (1)[she] is a member of a protected class; (2)[she] was qualified for [her] job and [her] job performance was satisfactory; (3)[she] was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. Under the now familiar *McDonnell Douglas* tripartite burden-shifting framework if [Plaintiff] succeeds in proving a *prima facie* case, the burden of going forward shifts to [Defendants], the employer, who must then articulate a non-discriminatory reason for the difference in treatment. Should [Defendants] articulate a non-discriminatory reason, the burden then shifts back to [Defendants] to demonstrate that [their] reasons were not true, but

instead were merely a pretext for discrimination.

*Bryant,* 288 F.3d at 133 (internal citations omitted). The undersigned concludes that the Plaintiff cannot make out a *prima facie* case that her job performance was satisfactory.

The evidence is beyond dispute that by the spring of 1999, the radio station was doing so poorly financially that the Plaintiff had almost no work to do. Since her job involved air-time advertising and few advertisements were being sold, she did not have enough work to keep her busy. In fact, Karen Birchfield testified that it took her only 45 minutes to do what it took the Plaintiff all day to accomplish. And, after the Plaintiff was terminated, Birchfield took over her responsibilities and performed them in one hour.

It is also not disputed that the Plaintiff was enlisted by Madrazo and assisted him in "covering up" his scheme to trade air time for services. Both Peace and Seeger testified that the Plaintiff admitted this to them and both individuals thought the Plaintiff had personally benefited from the scheme. Although this information alone was sufficient to justify termination, Plaintiff was not fired. Birchfield also testified that the Plaintiff failed to timely mail out bills to customers, waiting until 120 days after the proper time in order to make a commission by collecting the "over due" account.

Almost unanimously, the Plaintiff's co-workers found her difficult, uncooperative, mercurial, and by her own admission, subject to using profanity during arguments. During a staff meeting in April 1999, the Plaintiff admitted that she "said if I find out who's trying to set me up, I will kick your ass, or I will get someone else to do it for me." *Hill,* 354 F.3d at 298 (by the plaintiff's own admissions, she had failed to

demonstrate that she was performing her job duties at the level expected.). Nor were such threats a one time occurrence. Dawn Creasman averred that the Plaintiff threatened to "kick my white ass." The Plaintiff told Creasman that "I had my head up the General Manager's white ass" and when Creasman confronted Plaintiff as to why an advertisement did not run, she became belligerent and told Creasman that she was going to "kick my white ass." Karen Birchfield also testified that the Plaintiff called her "a bitch" and "threatened to kick my ass." When Green attempted to intercede, the Plaintiff raised her voice and slammed his office door. *King*, 328 F.3d at 148 (noting supervisor's attempt to reconcile the situation).

While it is true that Matt Cole and Jeannie Summerlin testified that they felt the Plaintiff's performance was good, neither of those individuals was in a supervisory position and each of them was openly antagonist towards the Defendants, particularly Defendant Green. *Id.*, at 149 ("King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting [his employer's] expectations. . . . 'The alleged opinions of [his] co-workers as to the qualify of [his] work are . . . close to irrelevant.'"). Both Cole and Summerlin testified that they left their jobs because they did not like Green. And, despite Summerlin's testimony that the Plaintiff performed adequately, other employees testified that Summerlin complained to Green about the Plaintiff's job performance.

Moreover, assuming *arguendo* that the Plaintiff could make out a *prima facie* case, the above conduct shows a non-discriminatory reason for terminating the Plaintiff. *Bryant*, 288 F.3d at 133. Plaintiff claims the allegations of her poor performance are mere pretext for Green's obvious racial prejudice. However, when the Defendants consolidated their four radio stations and terminated white workers, the Plaintiff was retained and given a raise so that she could make the drive from Marion to Asheville. Even after the Plaintiff admitted assisting Madrazo in an illegal scheme, she was not terminated. *Bryant*, 288 F.3d at 135 ("Bell Atlantic accommodated Bryant in ways that it did not accommodate other employees, Caucasian or African–American."). Co-workers testified that just as the Plaintiff had taken over a white employee's job previously, Birchfield took over the Plaintiff's job because there was not enough work to do. Plaintiff failed to make any showing that there was insufficient work; nor did she make any showing that her performance was equal to or better than that of Birchfield. The so-called "smoking gun" in this case consists solely of Green's comments which, while not politically correct or in the best of taste, are ambiguous, most likely taken out of context, and not related to the actual employment decision. *O'Connor*, 56 F.3d at 548–49.

### E. Plaintiff's claim of obstruction of justice

The common law cause of action for obstruction of justice in North Carolina has the elements of (1) performing any act (2) which prevents, obstructs, impedes or hinders (3) public or legal justice. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C.App. 20, 33, 588 S.E.2d 20, 29–30 (2003). The Plaintiff's claim of obstruction of justice is based on the presentation of an affidavit to her for signature which she claims contained false information which would have been used in a lawsuit between Blue Dolphin and Madrazo. However, the affidavit was not signed by the Plaintiff and she has not shown that it was used in the litigation. Assuming *arguendo* that the litigation at issue need not have involved the Plaintiff as a party, she still has

presented no evidence that the case at issue "was in some way judicially prevented, obstructed, impeded or hindered by the act[ ] of the defendants. There is no evidence as to the disposition of that action or any showing that the [affidavit] adversely impacted that case." *Id.* This claim will, therefore, be dismissed.

### F. Plaintiff's claim of termination in violation of public policy

For the same reasons as stated in this Court's previous decision herein, the undersigned will not dismiss the claim for violation of public policy based on the allegation that the Plaintiff was terminated for her refusal to sign a false affidavit. *Jackson v. Blue Dolphin Communications of N.C.,* 226 F.Supp.2d 785, 791–92 (W.D.N.C. 2002). She also claims her dismissal violated the public policy against racial discrimination. To the extent that claims remain viable pursuant to Title VII and § 1981, this claim survives summary judgment.

### VI. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment is hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1. All Title VII claims except the claim of discrimination and termination on the basis of race and for refusal to sign an affidavit are hereby **DISMISSED;**

2. All Title VII claims against Defendants American Media, Seeger and Peace are hereby **DISMISSED;**

3. All claims pursuant to 42 U.S.C. § 1981 against Defendants American Media, Seeger and Peace are hereby **DISMISSED;**

4. All Title VII and § 1981 claims against Defendants except a claim based on "mixed motives" theory are hereby **DISMISSED;**

5. The obstruction of justice claims are hereby **DISMISSED;** and

6. All claims based on violations of North Carolina public policy are hereby **DISMISSED** except to the extent based on "mixed motives" theory and refusal to sign an allegedly false affidavit.